Leland Stahelin, Plaintiff-Appellee, v. Board of Education, School District No. 4, DuPage County, Illinois, Defendant-Appellant.

Gen. No. 66–25.

Second District.

October 4, 1967.

Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, of Chicago, for appellant.

John Demling, of Glen Ellyn, for appellee.

MR. PRESIDING JUSTICE DAVIS delivered the opinion of the court.

This is a suit by the plaintiff, Leland Stahelin, against the Board of Education, School District No. 4, DuPage County, for a declaratory judgment that he had fully performed his contract to construct a new junior high school, and for a determination by the court of the balance which he claimed to be due him as general contractor on this project. The amount claimed included the balance due on the contract price and an additional sum for extra labor and materials furnished. The defendant claimed that a number of credits were due it under the construction contract. The trial court entered judgment for the plaintiff in the sum of $138,843.10, from which the defendant appealed.

This unfortunate incident began in the fall of 1962 when the defendant school board approved the plans of its architect, M. K. Young, for a new junior high school. All of the bids which were submitted on these plans were too high, and the architect was then authorized to alter the plans in an attempt to reduce the cost to between $1,-000,000 and $1,100,000. The plaintiff, whose original

bid was $1,413,800 then made a bid of $1,181,500, which was low and was accepted. The construction contract was entered into on March 25, 1963. One portion of the school building which was to be occupied November 1, 1963, was completed December 1, 1963; the other to be occupied February 1, 1964, was completed March 1, 1964.

The record in this case is voluminous and the greater part of the evidence pertains to the extras claimed by the plaintiff contractor, and the credits claimed by the defendant school board. Without elaboration relative to the numerous exhibits and the substantial testimony offered in behalf of both parties, which supports our conclusion, it is abundantly clear that the present dispute, in a large part, was the result of the acts of the architect. There were some errors in the plans, which was not an unusual circumstance. These errors were the basis of some of the plaintiff's claim for extras.

However, the architect assumed an arbitrary and unreasonable attitude in his dealings with the contractor; and, it must be said, under the evidence, that the architect had the support and approval of a majority of the defendant board in this respect. This undoubtedly caused much of the trouble which ultimately led to this litigation.

The defendant, through its architect, claimed credits were due it under the contract for things either not done by the contractor or for alterations in the contract, in the sum of $73,312. However, the defendant's own expert on direct examination eliminated $61,644.20 of these putative credits, leaving a balance of $11,667.80. On cross-examination, it further appeared that defendant's experts, testifying from hearsay, assumed some items to be missing from the completed structure which, in fact, where incorporated therein. Ultimately, the trial court allowed the defendant's credits to the extent of $5,557.03 and itemized those items for which a credit was given. After a long and exhaustive examination of

the record, we find that the determination of the trial court in this respect is adequately supported by the evidence and it will not be overturned or modified by us.

The most serious legal dispute arises with reference to the question of the extras claimed by the contractor, in the sum of $60,000. It is conceded that no evidence was presented relative to certain of these claimed extras. Such extras, and certain other of the claimed extras, which the plaintiff's evidence failed to sustain, including interest in the sum of $10,000, were disallowed. The court ultimately allowed the plaintiff's claim for extras in the sum of $44,196.34. The defendant presented no evidence relative to the values placed on the extras. It did not dispute that these extras were incorporated in the building. It claimed, however, that the plaintiff was not entitled to be reimbursed for the extras because of the manner in which they were authorized.

The defendant contends that sections 10–6 and 10–7 of the School Code (Ill Rev Stats 1965, c 122, pars 10–6, 10–7), preclude the plaintiff from recovering for the extras. Section 10–6 provides that no official business shall be transacted by the school board except at a regular or special meeting, and section 10–7 specifies that: "On all questions involving the expenditure of money, the yeas and nays shall be taken and entered on the records of the proceedings of the board." It is conceded that the expenditure for extras was not authorized by the school board by the taking of yea and nay votes nor was the payment of the claim for extras, as finally submitted, authorized in any manner.

The defendant also contends that the construction contract itself, bars the plaintiff from the right to recover for extras. The relevant portions of the contract are found in the General Conditions, and they are:

"A1–7 ARCHITECT'S SUPERVISION: The entire work shall be under the control and supervision of the Architect, M. K.

33

YOUNG & ASSOCIATES. The Architect shall, in connection with his duties, give such interpretation, verbally or by writing or drawing, as in his judgment the nature of the work may require; in deciding on the quality of all workmanship and materials; in giving any certificate that the Contractor may be entitled to and in setting (sic) all deuctions (sic) from or additions to the contract price, which may result from any alteration of the design or changes of plans, or extra work, after the contracts have been let; also in determining the amount of damages which may accrue from any cause . . .

"(d) MODIFICATIONS: The Owner reserves the right to alter or modify the drawings and specifications in any particular, and the Architect shall be at liberty to make any reasonable amount of deviation in the construction, detail or execution without in either case, invalidating or rendering void the Contract. In case any such alteration or deviation shall increase or diminish the cost of doing the work the amount to be allowed to the Contractor or Owner shall be such as may be equitably and justly determined by the Architect."

and

"A1–17 EXTRAS: It is distinctly understood that no extra of any kind will be allowed, except such extra or extras as ordered by the Architect in Writing . . .

"(b) EXTRAS: Whereever (sic) in any pro-
tion (sic) of the specifications, authority
is vested in the Architect or Engineer to
approve extra work or changes or adjust-
ment in the cost of the work, for what-
ever reason, or to approve extensions of
time, it is understood that such authori-
ty is conditioned on prior approval, spe-
cifically and in each case, by the Owner
and that the Contractor, if he so elects,
shall be justified in requesting proof of
such approval."

The defendant contends that paragraph A1-17 re-
quired that extras be ordered by the architect in writing
and with the specific prior approval of the board; and
that the extras were not ordered "in writing" and were
ordered without the prior specific approval of the board.

Soon after the inception of the work, there were
changes made in the plans. The architect advised the
plaintiff to keep a record of all such "extras and credits"
and that there would be an adjudication at the end of the
job. Lester Przewlocki, the school board superintendent
and ex officio member of the board, was the board repre-
sentative most often at the construction site. It seems
fair to conclude that, in addition to the architect, he
was, or assumed the role of, the representative of the
board at the construction site. He was not authorized to
give instructions or directions to the contractor, but he
kept informed on matters relating to the construction
and reported to the board.

Several other members of the board also went to the
construction site at the beginning of the construction
period and attempted to give the plaintiff instructions.
As to the latter persons, the school board president wrote
to the contractor, in June of 1963, advising the plaintiff,

"Your instructions will be received from the architect's office only. Should you choose to follow instructions of anyone other than the architect, or member of his staff, you do so at your own risk and peril."

With rare exception, all of the modifications and alterations in the plans and specifications were made at the request of the architect. However, only a few requests were made in writing. The defendant board contends that not only did it not authorize the extras, but also, that it was not even aware, until after the entire job was completed, that any claim for extras was to be made. Such contention, however, is contradicted by Przewlocki's testimony. He testified that he was present when the architect said that the items of extras and credits would be negotiated at the end of the job and that he so advised the board. Copies of correspondence between the architect and contractor, containing references to claims for extras, were also sent to the board. It is unbelievable that the board was not aware that the contractor was called upon from time to time throughout the construction to do work not called for in the contract and for which he would claim an extra charge.

The board, in its letter to the plaintiff, told the plaintiff that he was to take his orders and directions from the architect. Paragraph A1–7 of the contract provided that the entire work should be under the control and supervision of the architect. He was authorized to give instructions verbally to settle deductions from and additions to the contract price, which might result from alterations in the plans, or extra work. He was given the discretion of making any reasonable deviations in the construction, with an allowance to be made to the contractor or the owner, as the case might be. This is exactly what he did! From time to time he made modifications in the plans, many of which were absolutely necessary because of errors made in the plans; and both

owner and the contractor were advised of such changes, were aware and acquiesced in the fact that an adjudication of the extras and credits resulting from the changes would be made at the end of the job.

Much is made of the meaning of the word "extras" as used by the parties and as employed in the contract. It appears that paragraphs A1–7 and A1–17 may be inconsistent with reference to the authority given the architect over "extras" unless the provisions of each paragraph relate to different types of changes or modifications. Similar contracts have been interpreted in such manner. Paragraphs similar to A1–7 have been viewed as referring to minor alterations and changes, while paragraphs similar to A1–17 have been held to refer to material departures in the plans which result in a new and substantially different undertaking. Roemheld v. City of Chicago, 231 Ill 467, 470–472 incl., 83 NE 291 (1907); Roemheld v. City of Chicago, 131 Ill App 76, 84, 85 (1907), revd on other grounds, 227 Ill 160, 81 NE 45 (1907); City of Elgin v. Joslyn, 36 Ill App 301, 307 (1889). Here, however, paragraph A1–17, which might be construed to relate only to additions or changes in the plans which substantially change the nature of the undertaking, purports to apply to all changes or adjustments in the cost of the work for whatever reason. This would include "extras" resulting from minor modifications in the plans.

The terms "extras" and "credits" as used by the parties seemingly were used in the common parlance of the trade. As one of the defendant's witnesses stated, an extra is something the owner should pay for and a credit is something that the owner should receive an allowance for. If there is an authorized change or addition resulting in added cost to the contractor, it is an extra; if it results in a savings, it is a credit to the owner.

■ As to the provisions of paragraph A1–17 requiring that all extras ordered by the architect must be in

37

writing and that they must have the prior approval, "specifically and in each case" by the owner, these provisions are for the benefit of the owner and may be waived by it. City of Elgin v. Joslyn, supra, 307; County of Cook v. Harms, 108 Ill 151, 164 (1833). The architect required many changes and modifications, but only a few were made in writing. He did not feel obligated to obtain the prior approval of the board as to these changes. The board was aware that changes were being made for which extra compensation would be sought. It understood and consented to the procedure which was followed by its agent, the architect, in ordering certain changes, with the adjustment for extras and credits to be made at the end of the job. In its letter of June 12, 1963, the defendant directed the plaintiff, in writing, to take his instructions from the architect.

 To be sure, paragraph A1–17 gave the contractor the election, if he so chose, to request proof of the owner's·approval of each change, but he was not obligated to do so. A large number of the changes were of such nature and made at such time that if the contractor had halted construction and waited for the next defendant board meeting for approval, the building might not yet be completed. He was not obligated to wait and seek out such specific approval, and had he chosen to do so, it seems likely he would have been subject to severe criticism. The conduct of the architect and the board did not suggest to the plaintiff that such proof of approval was necessary. If it can be said that paragraph A1–17 required the directions of the architect to be in writing and the prior approval of the board to be a condition precedent to the plaintiff's right to collect for the extras he furnished, then it must also be said that defendant waived these requirements by its conduct.

The defendant is in the unenviable position of also asserting that it is entitled to a number of credits which were to be adjudicated upon completion of the job, but

that it is not obligated for any of the extras to be adjudicated in the same manner because it did not vote by yeas and nays on the expenditures for these extras, and that this was required by statute. We find this contention untenable. The board had authorized the execution of the contract on which the construction was based. The contract specifically permitted, and contemplated, changes and modifications in the construction for which there would be extras charged and credits given. This was a valid contract; the extras for which the plaintiff sought compensation and the modifications and omissions for which the defendant requested a credit on its account, were all based on the provisions of this contract.

█ At the time of the litigation stage of the dispute, it was too late in the day for the defendant to assert that it could not be estopped, under appropriate circumstances, from asserting a position inconsistent with its actions. Gregory v. City of Wheaton, 23 Ill2d 402, 407, 408, 178 NE2d 358 (1961). Estoppel may even be applied against the State when acting in its governmental capacity. The City of Quincy v. Sturhahn, 18 Ill2d 604, 614, 165 NE2d 271 (1960).

█ The doctrine of estoppel may be applied against school boards or districts. Seely v. Board of Education, 315 Ill 186, 197, 146 NE 187 (1925); Webster v. Toulon Tp. School Dist. No. 4, 313 Ill 541, 547, 145 NE 118 (1924); Sebastian v. School Directors, 306 Ill App 282, 28 NE2d 340 (1940). Whether the doctrine of estoppel may be applied against a municipal corporation in a given case will be determined from a consideration of all the circumstances of the case. If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it. Gregory v. City of Wheaton, supra; The City of Quincy v. Sturhahn, supra; 28 Am Jur2d,

Estoppel and Waiver, §§ 122, 123; 18 ILP, Estoppel, §§ 33 and 34.

■ In Allen v. Treat, 72 Ill App2d 466, 218 NE2d 250 (1966), the court reviewed a number of cases relating to contracts or transactions supposedly entered into by a public body which were void because of a complete want of power to act on the part of the governing body. In such cases the governmental body could not later be estopped from asserting its want of power and the invalidity of its contract.

In Allen, the court further considered a number of cases wherein the governing body did have the power to contract for what was done, but thereafter did something pursuant to this contract which was either irregular or invalid. On page 474, it referred to the case of County of Coles v. Goehring, 209 Ill 142, 70 NE 610, wherein a contract for the construction of a courthouse provided that it should be paid for in interest bearing county orders. In County of Coles, the court held that the fact that the provision for payment by county orders was invalid did not relieve the county of its obligation to pay, and at pages 474 and 475, the court stated:

> "In Hitchcock v. Galveston, 96 US 341 where a city agreed to pay for sidewalks in city bonds and the bonds were held to be invalid, it was decided that the city was liable upon its contract, and that, although it had agreed to pay in a way in which it had no power to pay, yet, having received the property, it was estopped to deny its power to contract; and it was there said by the Supreme Court of the United States: 'It is enough for them (the plaintiffs) that the city council have power to enter into a contract for the improvement of the sidewalks; that such a contract was made with them; that under it they have proceeded to furnish materials and

40

do work, as well as to assume liabilities; that the city has received and now enjoys the benefit of what they have done and furnished; that for these things the city promised to pay, and that, after having received the benefit of the contract, the city has broken it.'

"It makes no difference that the contract in the case at bar provided for payment in county orders, and that these county orders are invalid. In Hitchcock v. Galveston, supra, it was said: 'If payments cannot be made in bonds because their issue is ultra vires, it would be sanctioning rank injustice to hold that payment need not be made at all. Such is not the law. The contract between the parties is in force, so far as it is lawful.' "

In Allen, the court also quoted from Westbrook v. Middlecoff, 99 Ill App 327, 330, as follows:

"Where the statute authorizes a municipal corporation to exercise a certain power, but specifically regulates the mode in which it may be exercised, an attempt on the part of the municipal officers to override the regulations and exercise it in another manner will be restrained; but when the officers have so acted, and the municipality has received the benefits of a contract thus irregularly entered into, it is estopped from setting up the irregular exercise of the power when called upon to pay for what it has received."

Contracts entered into by a municipality which are expressly prohibited by law, and which under no circumstances can be entered into, are void and ultra vires. They may not be rendered valid thereafter by estoppel or ratification on the part of the municipality. However, there is another class of municipal contracts,

41

distinct from the void type heretofore referred to, wherein the municipality has the power to enter into the contract, but where a portion thereof may be beyond its power, or its power may have been irregularly exercised. As to this class of contracts, a municipality may not assert its want of authority or power, or the irregular exercise thereof, where to do so would give it an unconscionable advantage over the other party. Municipal corporations, as well as private corporations and individuals, are bound by principles of common honesty and fair dealing. McGovern v. City of Chicago, 281 Ill 264, 283, 284, 118 NE 3 (1917); The People v. Spring Lake Drainage & Levee Dist., 253 Ill 479, 500, 97 NE 1042 (1912); Allen v. Treat, supra, 475, 476.

In the present case the defendant had the general power to contract as it did. Apart from this it had the power to authorize expenditure of funds for the extras. It permitted the plaintiff to incorporate these extras into its building. The evidence established that the defendant had knowledge that it was intended that the amount of the extras and credits was to be adjudicated upon the completion of the work. It accepted the benefits resulting from this work and it cannot now be permitted to deny its obligation to pay for these items on the ground that there was no yea and nay vote taken to authorize the expenditure. Under the circumstances of this case and the contract provisions in question, the trial court was correct in holding that the defendant was liable for the extras.

The defendant also contended that the plaintiff was not entitled to payment because he refused to complete the project. Many items were listed on the punch list which the plaintiff was supposed to take care of to complete the building to the architect's satisfaction. The defendant contended at the trial, and still contends, that these items were not completed and, therefore, the plaintiff was not entitled to his money.

However, the defendant's own expert narrowed the punch list down to two items—cracks in certain walls and a claimed defect in a portion of the parking lot. The trial court accepted the testimony of plaintiff's expert that the cracks in the masonry were minimal and that this work was of high quality.

As to the portion of the parking lot or drive where the defendant claimed the blacktop was not of the thickness called for in the specifications, the evidence showed that after the plaintiff had installed the bitumen surface in question, a piece of heavy equipment, not related to plaintiff's work, traveled over a portion of the lot and damaged the blacktop. The portion thus damaged was the area complained of. The plaintiff, without extra charge, repaired this area. While the repair job was not of the same thickness as that called for in the specifications, it was apparently adequate and the trial court so found. Consequently, the trial court found that the contractor had completed his contract.

█ There was ample evidence to support all of the trial court's findings with reference to the extras claimed, the credits due, the completion of the work, and as to the knowledge of the board relative to the fact that charges were to be made for extras and credits allowed for any omissions. The trial was reputed to be the longest in the history of the county. The trial judge properly determined many technical matters relative to the issues of extras and credits. As there was competent evidence to support the findings made by the trial court, they will not be overturned by this court. In re Estate of Heyder v. Toms, 62 Ill App2d 318, 323, 210 NE2d 619 (1965).

The defendant also contends that the trial court erred in denying its motion for change of venue and in denying it leave to file a third party complaint against the architect.

**** As to the change of venue, defendant's right thereto, if based upon the alleged prejudice of the judge, is absolute, if the request for a change is made at the earliest practical moment. Roherty v. Green, 57 Ill App2d 362, 366, 206 NE2d 756 (1965); Howarth v. Howarth, 47 Ill App2d 177, 181, 197 NE2d 736 (1964). Once a court has considered a substantive issue in the cause, a party may not thereafter obtain a change of venue. The right to a change does not exist after a party has determined the court's attitude on some portion of the merits of a case. Swanson v. Randall, 30 Ill2d 194, 198, 195 NE2d 656 (1964); Johnson v. Schuberth, 40 Ill App 2d 467, 480, 189 NE2d 768 (1963); Roselawn Memorial Park v. DeWall, 11 Ill App2d 66, 69, 136 NE2d 702 (1956).

The defendant's petition for change of venue was filed on August 19, 1965. More than one-half year earlier, the court had entered an order finding that the plaintiff was entitled to $110,000 on the contract price that was not in dispute, and on December 30, 1964, ordered the defendant to pay this sum to plaintiff. On February 23, 1965, the court entered an order—pursuant to agreement that the issues be determined by arbitration by two building construction experts and the court—that the court rule on the questions of law and fact and the construction experts advise the court on questions of fact. At the time the petition for change of venue was filed, this order was in force and had been followed and partially carried out by the court, the experts and the parties.

On June 30, 1965, the court ordered an additional $80,000 to be paid to plaintiff. Without giving consideration to the claims for extras, the court at that time found that the contract balance approximated $103,000; that only minor punch list items remained; that the defendant no longer claimed a reserve of $25,000 for the punch list items; and that the contractor had substan-

44

tially performed the contract according to its terms. Accordingly, on said date, it ordered an additional $80,000 to be paid to the plaintiff. The record indicates that this order was later vacated, in an obvious effort to expedite matters, by agreement of counsel and after a notice of appeal therefrom was filed, at which time it was represented to the court that the deposition of the architect could be obtained and that the litigants had substantial hopes that the case could be settled. The fact that this order was vacated did not detract from the circumstance that the court had considered substantive issues in the cause, and that the defendant had determined the court's attitude on such issues.

The defendant seeks to equate all that was done by the court to pretrial conferences. It argues that these were all informal hearings and thus not a bar to a subsequent petition for change of venue. Roherty v. Green, supra, 368–370, incl.; Steiner v. Steiner, 44 Ill App2d 355, 194 NE2d 508 (1903).

The two orders entered by the court relative to the payment of monies were not informal directions. They were formal orders on substantive matters; the latter reciting that it was based on evidence before it and representations of counsel. The order relative to the matter of determining the dispute by quasi-arbitration procedures with two experts advising the court, was a formal order as to the manner the issues were to be resolved. Subsequent proceedings based upon this order also were not akin to pretrial conferences. It appears to us that by the time the defendant's petition for change of venue was filed, the court had ruled on a number of matters of substance in the case. It was then too late for the defendant to seek out another judge.

 As to the petition for leave to file a third party complaint against the architect: This request came a

year after the suit had been filed. A number of determinations had already been made, some of which were later vacated but all of which the court had every reason to believe were to remain final and binding. The matter had been continued on occasions at the defendant's request. It is true that the defendant changed counsel just prior to the time that it sought leave to file the third party complaint, and that its theory and approach to the case appeared to have changed at that time. However, this does not alter the fact that the filing of such a complaint would undoubtedly have further delayed litigation which had already imposed a hardship on the plaintiff. The defendant's petition to file a third party complaint against its own architect, whose acts and conduct it had sustained throughout the construction and during the litigation up to the time of filing such request, was characterized by procrastination and was dilatory in nature. The petition sought to inject new issues and theories into a lawsuit which was then already litigated in a substantial part. In the light of these circumstances, the trial court did not abuse its discretion in denying defendant leave to file its third party complaint.

For the reasons set forth herein, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN and ABRAHAMSON, JJ., concur.